**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**
**_____ DIVISION**

| | |
|---|---|
| **MONTEAGLE VENTURES, LLC,** **DUANE MILLER, and ERIC MACLEOD,** | **Case No. _____** |
| **Movants,** | |
| **v.** | **MEMORANDUM IN SUPPORT OF** **MOTION FOR RETURN OF PROPERTY** **AND INJUNCTIVE RELIEF** |
| **UNITED STATES OF AMERICA,** | |
| **Respondent.** | |

**TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 2

   A.  The First Seized Emails. ......................................................................................... 3

   B.  The Second Seized Emails. ...................................................................................... 7

   C.  Distinction between the Filter Team Procedures for the First Seized Emails and the Second Seized Emails. .................................................................................................... 9

   D.  Movants' Motion. .................................................................................................. 10

III. ARGUMENT ................................................................................................................ 10

   A.  Legal Standards. .................................................................................................... 10

   B.  Movants are entitled to modification of the Filter Team Procedures and the return of their privileged information. ........................................................................................... 12

      1.  At a minimum, Movants have raised questions going to the merits that warrant more deliberate investigation; at a maximum, Movants can show that they are correct on the merits. .................................................................................................................... 12

      2.  Movants would be irreparably harmed absent injunctive relief modifying the Filter Team Procedures and a return of their privileged information. ........................................... 17

      3.  The harm to Movants outweighs the harm (if any) the requested relief would cause to the government. ............................................................................................................. 19

      4.  Enjoining the Filter Team Procedures is not adverse to the public interest. .............. 21

IV. CONCLUSION ............................................................................................................. 22

## I.  <u>INTRODUCTION</u>

In recent years federal courts have increasingly scrutinized the Government's use of "filter teams" (sometimes referred to as "taint teams"), consisting of government lawyers (and sometimes non-lawyer investigators), as a mechanism for determining whether materials seized during the execution of search warrants should be withheld from prosecutors because of the attorney-client and/or work product privilege.

In this case the government executed search warrants on Google and thereby obtained thousands of emails belonging to Movants herein.  The materials included many communications involving attorneys.  With respect to the materials seized as a result of the first batch of warrants, the Government did not establish a filter team, and did not develop the procedures to be used by the filter team, until after the prosecution team had begun reviewing the seized emails.  With respect to the second batch of warrants, warrants that the Government procured at least a year and a half ago, Movants learned (on September 1, 2022) that the warrants contained filter team procedures ostensibly designed to cull out privileged materials before those materials could go to the prosecution team.  But Movants, being completely unaware that the Government was even seeking warrants, had no opportunity to participate or provide any input into the content of the filter team procedures.

The filter team procedures under both batches of warrants suffered from a common and fatal flaw:  they allowed the filter team the ability to declare certain emails as not privileged and turn them over to the prosecution team, with absolutely no opportunity for Movants to challenge, or a Court to review, the filter team's unilateral decision.  By deeming itself the final arbiter of privilege, the Government has impermissibly usurped the power of the Courts and obtained and retained possession of Movants' privileged communications and documents.  This ongoing

intrusion constitutes an irreparable injury for which Movants lack an adequate remedy at law. Accordingly, Movants now invoke Rule 41(g) of the Federal Rules of Criminal Procedure, and this Court's equitable jurisdiction, and ask the Court to grant them injunctive relief and a return of Movants' privileged information.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

In or about the spring of 2020, Movant Duane Miller learned that the federal government considered him a target of a criminal investigation. Attorneys from the United States Attorney's Office for the District of Colorado (the "USAO") and from the Tax Division of the Department of Justice (hereinafter referred to collectively as the "Prosecution Team" or "PT"), represented the United States in connection with the investigation. At a later point in time, Movant Eric MacLeod learned that he, too, was a target of the investigation. In June 2020, the PT caused 26 grand jury subpoenas duces tecum to be served on entities (including Movant Monteagle Ventures, LLC ("Monteagle")) allegedly owned and/or operated by Mr. Miller and Dr. MacLeod.

The investigation resulted from Movants' alleged participation in what the government calls "syndicated conservation easement" transactions. These transactions involve the purchase of real property and the subsequent execution by owners, as grantors, of recorded instruments (called conservation easements) naming qualified land trusts as grantees. By executing these instruments, the owners forego certain rights that they would otherwise enjoy to use or develop the property. These conservation easements are intended to promote ecological objectives, such as the protection of a natural habitat or the preservation of open space. Section 170(h) of the Internal Revenue Code generally allows the donor of a conservation easement to take a charitable contribution deduction on its tax return.

Syndicated conservation easements typically involve multiple people and the formation of multiple entities, such as limited liability companies and limited partnerships. These complex transactions implicate multiple areas of statutory and regulatory law, including but not limited to corporate, real estate, securities and tax. Not surprisingly, participants in the transactions customarily engage in extensive communications with their attorneys, as well as with accountants and other advisors. And, in this day and age, a substantial amount of that communication occurs via email.

Both Mr. Miller and Dr. MacLeod utilized email accounts associated with Monteagle (with the domain name "monteagleventures.com") in connection with easement transactions, and a great many of their email communications, as is typical, involved attorneys. In addition, both Mr. Miller and Dr. MacLeod used other email accounts (with the domain name "gmail.com") to engage in these communications. Sometimes they used these gmail.com accounts to discuss easement transactions with each other, with attorneys, and with others. And both Mr. Miller and Dr. MacLeod used their monteagleventures.com and their gmail.com accounts to conduct other business unrelated to easements, as well as for personal matters; in both cases, the emails frequently included communications with attorneys.

## A.    The First Seized Emails.

On April 5, 2021, counsel for Movants received letters from a separate group of attorneys from the USAO. Exhibit 1 at Appx. 1-6.[1] These attorneys (hereinafter the "Filter Team" or "FT") characterized themselves as distinct from the PT and stated that they, the FT, had no involvement in the PT's underlying investigation. *Id.* The letters informed Movants, for the first time, that the

---

[1] Exhibit 1 consists of all relevant correspondence compiled into a single appendix in chronological order for the convenience of the Court and completeness of the record. Hereinafter, this memorandum will refer to Exhibit 1 as "Appx."

Government had executed search warrants on Google. *Id.* Pursuant to the warrants, the Government had obtained thousands of emails (hereinafter the "First Seized Emails") sent to and from the email accounts d.miller@monteagleventures.com and E.MacLeod@monteagleventures.com. *Id.* The FT described itself as serving a screening function to address issues of privilege that arose with regard to the emails seized pursuant to the warrants.

Over the course of the seven-month period from April through October of 2021, during which time the FT and counsel for Movants (and occasionally the PT) communicated by way of letters and telephone conference, Appx. 7-45, Movants learned the following about the First Seized Emails:

- The search warrants that resulted in the production by Google of the First Seized Emails sought communications spanning from December 20, 2016 through December 12, 2019 with respect to Mr. Miller and January 1, 2016 through May 4, 2020 with respect to Dr. MacLeod. Appx. 16.

- The First Seized Emails consisted of approximately 20,000 communications.

- Google initially produced emails with respect to Mr. Miller and later produced emails with respect to Dr. MacLeod. Appx. 24-25.

- After the receipt by the Government of the first batch of documents, a non-attorney IRS Special Agent, not part of the PT, made a cursory review of the emails. She provided to the PT all emails she determined to be not privileged. Appx. 24.

The PT began reviewing emails from Mr. Miller's account. Appx. 2, 4, 5-6, 24. About 65 emails into the review, the PT discovered an email which indicated that the sender had "carbon-copied" an attorney as a recipient. *Id.* The PT ceased its review and sent the emails to an IRS

Special Agent to assess whether the situation warranted the creation of a filter team.[2]  Appx. 24-25.  The PT retained access to the date, sender, recipient(s) and subject line of every email within the First Seized Emails.  Appx. 2, 4, 6, 25.  To the best of Movants' knowledge, the PT still possesses that information for all of the First Seized Emails.

The FT reviewed the First Seized Emails and divided them into three categories: (1) documents the FT believed to be privileged;[3] (2) documents the FT did not believe to likely be privileged but as to which the FT believed that Movants might assert claims of privilege; and (3) documents the FT determined to be not privileged, which documents Movants and the FT (and this Memorandum) labeled the "Category 3" documents.  Appx. 1-6, 14.  The FT sent, with its April 5th letters and as supplemented afterwards, those documents it placed in the first and second categories, and advised Movants that if Movants did not assert privilege with respect to the documents in the second category within two weeks following receipt, the FT would provide them to the PT.[4]  In sum, the FT provided to Movants approximately 9,000 emails from the First Seized Emails.

---

[2] Movants understand that documents responsive to the search warrant for Dr. MacLeod's email account were provided by Google after the PT's decision to cease review.  Appx. 25.  Accordingly, as Movants understand it, Dr. MacLeod's monteagleventures.com emails, when ultimately provided by Google, went directly to the FT and were not reviewed by the PT.  *Id.*

[3] The Filter Team has not actually acknowledged these documents as privileged.  Instead, they identified this category of documents as documents to be returned to Movants "out of an abundance of caution."  Appx. 1 and 3. The Filter Team acknowledged that this category includes communications with attorneys but asserted that "many of these documents are not privileged for a variety of reasons."  *Id.*

[4] At a later point, the PT requested Movants review the documents in the first category for privilege; Movants understand that documents in the first category as to which Movants did not assert privilege were released by the FT to the PT.  Movants do not know if the FT retained copies of the documents that Movants identified as privileged within the first category.

For the second category, Movants and the FT ultimately reached an agreement which allotted Movants more than fourteen days to review the documents.  Movants did review those documents and have asserted privilege as to some of them.  Movants assume that the FT has not provided those documents to the PT, although the FT has promised only that if Movants claimed privilege as to documents within the second category, the FT would "confer with [counsel for Movants] before providing those documents to the" PT.  Appx. 2, 4, 6; *see also* Appx. 33 ("We will not release any of those Category 2 documents to the [PT] before we have a chance to confer with you about those documents.").

---

From the very beginning, the FT intended to provide the Category 3 documents to the PT without affording Movants an opportunity to review them and assert claims of privilege. Appx. 14. The FT's April 5, 2021 letters, in fact, stated that the FT had already given them to the PT. Appx. 2, 4, 6. Movants subsequently learned that technical issues had held up the production of the Category 3 documents to the PT. Appx. 14; *see also* Appx. 18. In September 2021, however, the FT advised Movants that it had turned over to the PT the Category 3 documents. Appx. 41. During their discussions with the FT, counsel for Movants repeatedly objected (orally and in writing) to production of the Category 3 documents to the PT without a chance for Movants to review them. *See, e.g.* Appx. 7-8, 10, 13-15, 23, 39-40, 44. Counsel for Movants lodged objections as early as April 16, 2021, as late as October 22, 2021, and a number of times in between. *Id.*

In May 2021 the FT asked counsel for Movants to provide to the FT a list of attorneys involved with Movants during the time periods specified in the search warrants. Appx. 16-17. That same month Movants provided such a list to the FT but cautioned that the list was compiled from "the information we have available at this time." Appx. 19. On July 26, 2021, the FT provided to Movants documents which the FT had originally categorized as Category 3 documents but which, based on the list of attorneys provided by Movants two months earlier, the FT had now determined it would not provide to the PT. Appx. 28-29. The FT's communication of July 26, 2021 made clear that as of that date it still had not provided to the PT the Category 3 documents.[5] *Id.* As stated above, however, in September the FT advised Movants that it had turned over to the PT the Category 3 documents. Appx. 41. Movants have never had the opportunity to review the

---

[5] Although the July 26th correspondence again threatened to provide information to the PT "as soon as feasible," Movants understood that production did not happen due at least in part to ongoing communications between Movants and the FT regarding the production of document "families," such as email attachments that had not been provided for review when the parent email had been provided and vice versa. Appx. 30, 32-33.

Category 3 documents for the purpose of asserting privilege, despite repeated requests to the FT for a chance to do so.

**B.      The Second Seized Emails.**

During a call with the FT on April 28, 2021, Movants learned that the government had executed a second set of search warrants on Google.  Based upon the information provided in that call as well as provided subsequently, Movants understand that these warrants related to an email account associated with Mr. Miller (dcfamilyinvestments@gmail.com), one associated with Dr. MacLeod (wemacleod@gmail.com) and one associated with a third person.  Appx. 52.  The search warrants covered the time period January 1, 2015 through March 30, 2021 for Mr. Miller's account, January 1, 2016 through March 30, 2021 for Dr. MacLeod's account, and May 1, 2016 through March 30, 2021 for the third person's account.  *Id.*

In discussions between Movants' counsel and the FT during 2022, Movants learned that this second round of Google search warrants netted the government a total of about 150,000 emails (the "Second Seized Emails").  Appx. 56.  The FT also advised Movants that it intended to utilize a review process different from (and in Movants' view) inferior to the (already-insufficient) process used in connection with the First Seized Emails.  Unlike in the case of the First Seized Emails, the FT did not plan to make an email-by-email examination of the Second Seized Emails. Instead, the FT intended to run computer searches and apply "search terms" consisting of the names of attorneys provided by Movants to the FT in May 2021 (despite Movants' indication at that time of the possibility that the list could be incomplete, a concern Movants reiterated to the FT in 2022).  Appx. 60, 70.  The FT could not confirm that its process would identify privileged

emails that did not contain the name of an attorney.[6]  Appx. 70.  The FT further advised that after running the computer searches of the 150,000 emails, the FT would provide to the PT all emails not containing a search term.  Appx. 70.  For those emails that did contain a search term, the FT would provide those emails to the Movants for review and assertion of privilege.  *Id.*

Movants' counsel specifically asked the FT for the opportunity to review the 150,000 emails in order to assert privilege over those as to which it felt a privilege claim to be appropriate.  Appx. 65.  Counsel committed that it would perform this task expeditiously so as not to unduly delay the government's investigation.  *Id.*  The FT did not agree to this request.  Appx. 70.

On July 26, 2022, the FT advised Movants that it ran the search and obtained approximately 22,000 "hits," that is, emails containing one or more search terms.[7]  *See* Appx. 60.  On August 23, 2022, the FT invited Movants to propose additional search terms.  Appx. 53.  On August 25, 2022, Movants' counsel responded to that invitation with an email explaining the practical problems in finding search terms that would sufficiently identify privileged documents.  Appx. 65.  Movants' counsel reiterated its earlier requests to review all the emails.  *Id.*

The FT replied on September 1, 2022.  Appx. 70.  The FT advised Movants that the District Court's approval of the search warrants included a filter protocol and that the FT intended to follow

---

[6] For example, if Mr. Miller sent Dr. MacLeod an email that said, "Our lawyers told me that . .", Movants contend that that message would be privileged, but the FT's methodology would not detect it.  Indeed, it is unclear if the FT's methodology would provide emails to Movants for review even if the body of the email explicitly refers to an attorney by name if the email does not have an attorney copied as a sender or recipient.  *See* Appx. 70 ("That protocol … lays out that the filter team will identify and segregate communications to/from attorneys").  Thus, Movants do not know if the search terms are being applied to the emails as a whole or *only* to the "To," "From," "CC", and (possibly) "BCC" fields of the emails.

[7] Movants observe that the computer search applied to the Second Seized Emails resulted in a "hit rate" of less than 15% (22,000 hits out of 150,000 emails).  In contrast, the procedures utilized by the FT in connection with the First Seized Emails (in which the FT actually examined the emails) yielded approximately 9,000 emails (out of 20,000, or 45%) that the FT saw fit to return to Movants either outright or for further review.

that protocol.[8]  *Id.*  That protocol did not include allowing Movants to review all of the Second

Seized Emails.  *Id.*  Rather, the protocol provided that the FT would run its computer searches.  *Id.*

If the searches identified a document as containing a search term, the FT would not provide it to

the PT without either consulting with defense counsel or obtaining the approval of the Court.  *Id.*

But, as the FT stated, "It is contemplated that the filter team will provide all communications that

do not involve an attorney or are otherwise subject to attorney-client privilege to the investigative

team for its review."  *Id.*  In other words, if the computer fails to "hit" on a document, the FT

intends to hand it over to the PT with no involvement by either Movants or the Court.

**C.**     **Distinction between the Filter Team Procedures for the First Seized Emails and the Second Seized Emails.[9]**

1.   For the First Seized Emails, Movants understand that the Filter Team reviewed each

     email individually.  For the Second Seized Emails, the FT intends to rely solely on

     computer searches to separate potentially privileged from presumptively not privileged

     emails.

2.   If the Filter Team Procedures (First Seized Emails) identified an email as potentially

     privileged, the FT did not provide it to the PT and provided it to Movants to allow

     Movants to indicate whether they regard the email as privileged.  If the Filter Team

     Procedures (Second Seized Emails) identify an email as potentially privileged, the FT

---

[8] Movants ask the Court to keep in mind that Movants had no knowledge that the PT was presenting warrant applications to the Court and no opportunity to participate in any of the PT's discussions with the Court about the filter protocol.  Stated differently, the PT's filter protocol discussions with the Court at the time of the warrant applications were *ex parte* communications.

[9] When referring to procedures common to the procedures utilized by the FT for both the First Seized Emails and the Second Seized Emails, this Memorandum will use the term "the Filter Team Procedures".  When referring to procedures relevant to only one batch of emails, this Memorandum will use the term "the Filter Team Procedures (First Seized Emails)" or "Filter Team Procedures (Second Seized Emails)", as the case may be.

will provide it to the PT only if (a) Movants consent, or (b) the Court reviews the email and determines that it is not privileged.

3. For both batches, if the Filter Team Procedures identify an email as presumptively not privileged, the FT provides it to the PT *without seeking any input from either Movants or the Court*.

**D.  Movants' Motion.**

Movants have now filed their Motion for Return of Property and for Injunctive Relief ("the Motion").  Broadly speaking, the Motion asks the Court to order modified procedures ("Movants' Proposed Procedures") for reviewing the seized emails for privileged communications.  For the First Seized Emails, the Motion asks for the return of Category 3 documents and for an order enjoining the Filter Team from providing any other document to the Prosecution Team without the opportunity for Movants to review the document and consent or, if Movants assert privilege and the Filter Team disagrees, for the Court to review the document and decide whether it is privileged. For the Second Seized Emails, Movants ask for the return of the documents and for an order enjoining the Filter Team from sharing any document with the Prosecution Team without the same opportunity for Movants to review the document and assert privilege, with Court review if Movants and the Filter Team disagree as to whether privilege applies.

## III.  ARGUMENT

**A.  Legal Standards.**

Rule 41(g) of the Federal Rules of Criminal Procedure represents the appropriate vehicle for Movants to seek the return of the Category 3 documents and the Second Seized Emails.  The Court can consider a Rule 41(g) motion for the return of property, even though no indictment has been returned, *see Floyd v. United States*, 860 F.2d 999, 1006 (10th Cir. 1988), because the request seeks relief from an ongoing intrusion into the continued possession of and lack of protection for

Movants' privileged information.  *See Harbor Healthcare System, L.P. v. United States*, 5 F.4th 593, 600 (5th Cir. 2021).  Equitable principles govern a Rule 41(g) motion, with the movant bearing the burden of establishing that the retention of the property by the government is unreasonable.  *United States v. Nelson*, 190 Fed. Appx. 712, 714 (10th Cir. 2006).  To be entitled to relief under Rule 41(g), a movant must show that (1) it has no adequate remedy at law, and (2) it would be irreparably harmed by a failure to return the property at issue.  *Floyd*, 860 F.2d at 1003.  In this case, as discussed below, Movants can make these showings.

Applicable equitable principles also support Movants' request for modification of the Filter Team Procedures and the use of Movants' Proposed Procedures.  Courts have considered such requests as properly brought under Rule 41(g) and have evaluated those requests according to the standards governing the adjudication of a motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.  *See*, *e.g.*, *In Re: Sealed Search Warrant and Application for a Warrant by Telephone or Other Reliable Electronic Means*, 11 F.4th 1235 (11th Cir. 2021) ("*Optima*");  *United States v. Ritchey*, ___ F. Supp. 3d ____, No. 1:21-CR-6, 2022 WL 3023551 (S.D. Miss. June 3, 2022)*; see also In Re: Search Warrant Issued June 13, 2019*, 942 F.3d 159, 176 (4th Cir. 2019) ("*Baltimore Law Firm"*)(treating collectively, using preliminary injunction standards, a party's request for an injunction to enjoin the government's review of seized documents and a Rule 41(g) motion for the return of the documents).  A litigant seeking a preliminary injunction must establish a substantial likelihood of success on the merits, irreparable harm in the absence of preliminary relief, that the harm outweighs whatever damage the proposed injunction might cause the opposing party, and that an injunction would not be adverse to the public interest.  *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).  In cases where the movant has prevailed on the other factors, the Tenth Circuit uses a liberal definition of "likelihood of

success": the plaintiff need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (internal quotations omitted).

**B.      Movants are entitled to modification of the Filter Team Procedures and the return of their privileged information.**

> *1.      At a minimum, Movants have raised questions going to the merits that warrant more deliberate investigation; at a maximum, Movants can show that they are correct on the merits.*

Movants should prevail because the Filter Team Procedures utilized in this case anoint federal prosecutors, *i.e.,* the FT, as the final arbiters as to what is privileged and what is not, allowing documents to go to the PT without affording Movants the opportunity for judicial resolution of disagreements as to whether a document is privileged.  In recent years (indeed, in recent months) Courts – for multiple reasons – have struck down filter team procedures almost identical to those used in this case.  In *Optima*, a magistrate judge initially approved a search warrant with a filter team protocol allowing the filter team to provide to the prosecution team all communications that did not appear to involve an attorney.  *Optima*, 11 F.4th at 1240.  Following execution of the warrant certain individuals and companies were allowed to intervene in the matter and sought to enjoin the government's review of the documents.  After hearing arguments, the magistrate modified the filter team protocol in a number of respects.  Most importantly for present purposes, the magistrate required the filter team to allow movants to review all the seized documents first, before any of them went to the prosecution team, in order to assert privilege.  The magistrate's modified protocol then set up a mechanism for resolving disagreements between movants and the filter team, ultimately providing that no document as to which movants claimed privilege could go to the prosecution team unless movants agreed or a court, or court-appointed

special master, so ruled.  *Optima*, 11 F.4th at 1240-43.  The Court of Appeals affirmed that process.  *Id.* at 1252.

More recently, in *Ritchey*, a magistrate judge in Mississippi took a similar approach.  That case, like this one, involved two search warrants.  As here, the first search warrant did not set forth a written filter team protocol while the second one did.[10]  *See* 2022 WL 3023551 at *1.  As here, the filter team provided to the prosecution team documents seized pursuant to the first warrant which the filter team deemed non-privileged but no documents seized pursuant to the second warrant had gone to the prosecution team at the time the Court ruled on movant's Rule 41(g) motion.  *Id.* at *4.  As here, the filter team protocols allowed the filter team to provide documents to the prosecution team without providing the movant with the opportunity to object and obtain judicial review.  *Id.* at *1-2.

The Court deemed the filter team protocol inadequate, identifying as its primary, but not only, flaw that it "vested the final privilege determination in the filter team."  *Id.* at *6-7.  The Court ordered the prosecution team to return all seized documents to the filter team (and to destroy all copies in the prosecution team's possession), and it enjoined the filter team from any further review until after Court-approval of a new filter team protocol.  *Id.* at *9.

This Court should follow the examples of *Optima* and *Ritchey* and grant Movants' motion in this case because, as those Courts understood, allowing the FT to make the final call as to whether a document is privileged usurps judicial functions and implicates separation of powers

---

[10] The Court found, however, "that the same filter team protocol governed review of the materials seized under each Warrant."  *Ritchey*, 2022 WL 3023551 at *4.  In the case at bar, the Filter Team Procedures (First Seized Emails) differ from the Filter Team Procedures (Second Seized Emails) in that, with respect to the first batch of emails the FT actually reviewed the documents while, with respect to the second batch the FT relied solely on computer searches to distinguish potentially privileged from non-privileged documents.  Importantly, however, the two sets of procedures share the characteristic of allowing the FT to declare certain emails as non-privileged and deliver them to the PT, with no input from Movants or the Court.  The filter team protocols in *Ritchey* also shared that feature, a feature which, as discussed below, the judge found to render the protocols fatally flawed.

concerns.   "We have recognized that, when a dispute arises as to whether a lawyer's communications or a lawyer's documents are protected by the attorney-client privilege or work-product doctrine, the resolution of that dispute is a judicial function."  *Baltimore Law Firm*, 942 F.3d at 176.  "[T]he magistrate judge – by authorizing the Filter Team and its Protocol – erred in assigning judicial functions to the executive branch."  *Id.*;[11] *see also Optima*, 11 F.4th at 1251 (magistrate judge's modified filter protocol affirmed because it "did not assign judicial functions to the executive branch")*; NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 498, 500 (4th Cir. 2011) (in deciding whether to enforce an administrative subpoena seeking potentially privileged documents, a court "cannot delegate" an in camera review of documents to an agency, but must itself decide a claim of privilege); *In re The City of New York*, 607 F.3d 923, 947 (2d Cir. 2010) (evaluation of a privilege claim is always a judicial function); *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 256 (4th Cir. 2005) (remanding to district court for *in camera* review concerning privileged communications and applicability of crime-fraud exception).

In addition to the usurpation of the judicial role in determining privilege disputes, allowing the FT here to hand over emails to the PT with no review by Movants or oversight by a court implicates other problems which courts have identified.  As several courts have acknowledged, a filter team might "have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and ... some [filter] team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that [filter] teams pose a serious risk

---

[11] Some commentators and litigants have interpreted *Baltimore Law Firm* as holding that the mere use of a filter team to review privileged documents under the auspices of making a privilege determination constitutes a *per se* intrusion into the attorney-client privilege.  *See, e.g.,* M. Dore, "Privacy Rights After *Carpenter*," 43 Los Angeles Lawyer 24, 28-29, July/August 2020 (discussing *Baltimore Law Firm* under the heading "End of the Taint Team").  At least two courts have stated that if *Baltimore Law Firm* so holds, they disagree with that holding.  *See Ritchey*, 2022 WL 3023551 at *3-4 (*citing In Re Search Warrants Executed on Apr. 28, 2021*, No. 21MC425 (JPO), 2021 WL 2188150 at *2 n.3 (S.D.N.Y. 2021)).  Movants' position in this case does not require a determination that filter teams are *per se* improper, and Movants do not advance that argument here.

to holders of privilege." *Baltimore Law Firm*, 942 F.3d at 177 (*citing In Re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006) ("*Winget*")).

The *Winget* case arose when the plaintiffs learned that a third party had received two grand jury subpoenas to produce documents that would include documents subject to the plaintiffs' claims of privilege.  The plaintiffs intervened and sought the right to conduct their own privilege review of the documents responsive to the subpoenas. *Winget*, 454 F.3d at 514.  The challenged filter team protocols in *Winget* mirrored the Filter Team Procedures here: they allowed the filter team to return to the privilege-holders documents it determined to be privileged; to submit to the privilege-holders documents it determined to be potentially privileged, with adjudication by the district court of any disagreements; and to produce directly to the grand jury documents it deemed not privileged. *Id.* at 515.  In other words, in *Winget*, as here, the plaintiffs were challenging a filter team protocol under which the government's filter team – not the privilege-holders nor the court – determined which documents were privileged.  Plaintiffs sought to modify the protocols to allow their counsel to conduct the initial privilege review, create a log of any documents for which they claimed privilege, and then submit any resulting privilege disputes to the court. *Id.* at 516.[12]

The Sixth Circuit held that the government's protocol failed to sufficiently protect the plaintiffs' claims of privilege, taking particular issue with the failure of the protocol to impose any meaningful check on the filter team's determinations that an item was not privileged.  The Court was concerned that any government team, even if walled off from the investigating team, would have a conflict of interest in reviewing the documents between an interest, as filter team members, in preserving privilege versus an interest, as prosecutors, in pursuing an investigation.  Because

---

[12] The Sixth Circuit noted that the plaintiffs' proposed procedure "seems to reflect a fairly standard practice by which law firms conduct privilege reviews when responding to government subpoenas or other discovery requests." *Winget*, 454 F.3d at 516.  Indeed, this is precisely how Movants have protected their privileged information in responding to the twenty-six grand jury subpoenas served in this investigation upon Monteagle and other entities.

"human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations;" therefore it is "logical to suppose that taint teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience." *Winget*, 454 F.3d at 523. The Court went on to describe an "obvious flaw" in the procedure currently in place: "the government's fox is left in charge of the appellants' henhouse, and may err by neglect or malice, as well as by honest differences of opinion." *Id.*

In *Optima*, discussed *supra* at Sect. III.B.1., the Eleventh Circuit expressed similar concerns. In upholding the magistrate judge's modified filter protocol, which allowed the movants to perform the initial privilege review and prohibited purportedly privileged documents from going to the prosecution team without movants' permission or Court approval, the appellate court noted favorably, "This means that the filter team cannot inadvertently provide the investigation team with any privileged materials." *Optima*, 11 F.4th at 1249; *see also Baltimore Law Firm*, 942 F.3d at 177 ("filter team errors can arise from differences of opinion regarding privilege ... a filter team's members 'might have a more restrictive view of privilege' than the subject of the search, given their prosecutorial interests in pursuing the underlying investigations.... That 'more restrictive view of privilege' could cause privileged documents to be misclassified and erroneously provided to an investigation or prosecution team") (*quoting Winget*, 454 F.3d at 523).

In sum, Filter Team Procedures create "a clear appearance of – and potential for – improprieties when government agents are authorized to rummage through attorney-client communications." *Baltimore Law Firm*, 942 F.3d at 176. Here, allowing the Government, an adverse party, to unilaterally make privilege determinations for Movants without the opportunity for objection by Movants, without oversight by a court, and potentially in direct contravention to privilege determinations made by Movants when reviewing comparable information in responding

to their own subpoenas, does not sufficiently protect Movants' privilege and will chill the free flow of information between clients and lawyers.  As a result, the FT is not the appropriate party to decide those issues, and Movants have a substantial likelihood of success on the merits of their contention that the Filter Team Procedures are legally flawed.

       2.     *Movants would be irreparably harmed absent injunctive relief modifying the Filter Team Procedures and a return of their privileged information.*

This Court should have little difficulty concluding that the retention by the PT of potentially-privileged materials, and the threat of the FT to provide even more such materials to the PT, constitute the type of irreparable harm justifying the relief sought in the Motion.   As the Court in *Ritchey* put it, "[I]t is well-established that 'an adverse party's review of privileged materials seriously injures the privilege holder.'"   *Ritchey*, 2022 WL 3023551 at *7 (quoting *Baltimore Law Firm*, 942 F.3d at 175)).  The purpose of the attorney-client privilege is to ensure "full and frank communication" between a client and his lawyer and "thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *see also Baltimore Law Firm*, 942 F.3d at 173-74 ("attorney-client privilege is 'the oldest of the privileges for confidential communications known to the common law'") (quoting *Upjohn*); *Winget*, 454 F.3d at 519 (same). As the Supreme Court has consistently emphasized, the attorney-client privilege exists because "sound legal advice or advocacy serves public ends and ... such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389; *see also Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.").

Work-product privilege operates for a similar purpose: "that people should be free to make requests of their attorneys without fear, and that their attorneys should be free to conduct research and prepare litigation strategies without fear that these preparations will be subject to review by outside parties."  *Winget*, 454 F.3d at 520; *see also Baltimore Law Firm*, 942 F.3d at 174-75 ("[a]lthough the work-product doctrine does not trace as far into history as the attorney-client privilege, it is no less important") .

These privileges, and a general respect for and deference to a proper claim of privilege, play "a vital role in assuring the proper functioning of the criminal justice system and provide a means for a lawyer to prepare her client's case." *Optima*, 11 F.4th 1235 at 1249 (quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)).  It is, therefore, axiomatic "that an adverse party's review of privileged materials seriously injures the privilege holder." *Baltimore Law Firm*, 942 F.3d at 174; *see also United States v. Philip Morris Inc*., 314 F.3d 612, 622 (D.C. Cir. 2003) (party demonstrated the likelihood of irreparable harm predicated on "the general injury caused by the breach of the attorney-client privilege and the harm resulting from the disclosure of privileged documents to an adverse party"); *In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997) ("forced disclosure of privileged material may bring about irreparable harm"); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 960-61 (3d Cir. 1984) (law firm demonstrated likelihood of irreparable harm where government seized thousands of files containing privileged information).

Moreover, that harm is plainly irreparable, as the Government's review of Movants' privileged materials cannot be undone.  Additionally, if Movants' privileged materials are not returned to them and if the Filter Team Procedures are not enjoined as described more fully herein, Movants will have no other adequate remedy at law.  *Optima*, 11 F.4th at 1247 (a return of property pursuant to Rule 41(g) "offers the remedy of returning to the Intervenors any improperly seized

documents protected by privilege *before* the government has reviewed them.  Unlike suppression, that is a remedy that can redress any potential injury by ensuring it does not occur in the first place.") (emphasis in original); *Harbor Healthcare System,* 5 F.4th at 600 ("Harbor remains injured as long as the government retains its privileged documents.  That injury can only be made whole by the government returning and destroying its copies of the privileged material.").

Movants satisfy this prong of the test for the relief they seek.

> 3.  *The harm to Movants outweighs the harm (if any) the requested relief would cause to the government.*

The harm caused to Movants by the continued Government review of their privileged materials outweighs any harm to the Government that might result from allowing Movants to conduct its own privilege review and deferring the resolution of any disputed privilege issues to a supervising court.

The Sixth Circuit's analysis in *Winget* is instructive.  There, the Court recognized the two types of errors that could be made in any privilege determination: unprivileged documents misidentified as privileged (Type I errors) and privileged documents misidentified as unprivileged (Type II errors), and explained that:

> It is reasonable to presume that the government's taint team might have a more restrictive view of privilege than appellants' attorneys. But under the taint team procedure, appellants' attorneys would have an opportunity to assert privilege *only* over those documents *which the taint team has identified* as being clearly or possibly privileged. As such, we do not see any check in the proposed taint team review procedure against the possibility that the government's team might make some false negative conclusions, finding validly privileged documents to be otherwise; that is to say, we can find no check against Type II errors in the government's proposed procedure. On the other hand, under the appellants' proposal, which incidentally seems to follow a fairly conventional privilege review procedure employed by law firms in response to discovery requests, the government would still enjoy the opportunity to challenge any documents that appellants' attorneys misidentify (via the commission of Type I errors) as privileged.

*Winget*, 454 F.3d at 523 (emphasis in original).  In short, while the filter team was unlikely to commit any Type I errors, their proposed protocols provided *no* opportunity to correct any Type II errors that could occur.  By allowing the appellants to conduct their own privilege review Type II errors would be unlikely, and the filter team and overseeing court *would* have the opportunity to correct Type I errors.  Allowing the privilege-holders to conduct the initial review for privilege with a reasonable opportunity for the government to challenge an assertion of privilege – a proposal roughly analogous to Movants' Proposed Procedures – provided protection against both types of privilege determination errors.  In contrast, allowing the taint team to unilaterally release documents it autonomously determined to be unprivileged without a reasonable opportunity for the appellants to challenge a denial of privilege – a proposal roughly analogous to the Filter Team Procedures – provided protection *only* against a false positive error.  In other words, modifying the filter team procedures to allow a privilege holder the opportunity to contribute to a privilege determination protects *both* parties, while the original procedures protect *only* the government.

When the Court in *Ritchey* compared the harm to Ritchey to any harm the injunction might cause the government (which the Court called "balancing the equities"), the Court concluded, "Here the equities weigh heavily in Ritchey's favor." *Ritchey*, 2022 WL 3023551 at *8.  The Court noted that if it granted the relief sought, "the Government might be slightly delayed" in moving forward with its case and might incur some additional costs in properly filtering the seized materials.  But, said the Court, "the Government has not identified any concrete reason why a delay or continuance would be more than an inconvenience.  There is a comparatively small risk of harm to the Government." *Id.*; *see also Baltimore Law Firm*, 942 F.3d at 181 (any delay that might result from granting relief does not weigh in the government's favor; government should have anticipated the filter team challenges and the delay they would entail and, "in any event, delay

in the government's investigations here does not outweigh the harm to the Law Firm and its clients caused by the Filter Team's review").

This Court should reach the same conclusion. Because the relief requested by Movants alleviates the harm to Movants caused by the Filter Team Procedures while causing little, if any, harm to the Government, the balance of the equities favors Movants.

> 4.    *Enjoining the Filter Team Procedures is not adverse to the public interest.*

Movants here would be hard-pressed to state the matter any better than did the magistrate judge in *Ritchey*: "It is well-established that protection of the attorney-client privilege typically supports the public interest . . . . Superseding [the government's] filter team protocol with one that adequately protects Ritchey's privilege will serve the public interest. This prong weighs in Ritchey's favor." *Ritchey*, 2022 WL 3023551 at *8; *see also Baltimore Law Firm*, 942 F.3d at 182 (noting "'the strong public interest' in the integrity of the judicial system," which injunctive relief will support). As identified above, *see supra* at Section III.B.2., the privileges at issue play "a vital role in assuring the proper functioning of the criminal justice system and provide a means for a lawyer to prepare her client's case." *Optima*, 11 F.4th at 1249 (quoting *United States v. Nobles*, 422 U.S. at 238).

By allowing an *adverse party* to determine whether *Movants* can claim privilege as to their own information, the Filter Team Procedures create both a risk to privilege and the appearance of unfairness to Movants. As the Sixth Circuit has noted:

> [T]aint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors. That is to say, the government taint team may have an interest in preserving privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is, occasionally some taint-team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that taint teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience.

*Winget*, 454 F.3d at 523; *see also United States v. Gallego*, No. 4:18-cr-01537, slip op. at 4-6, 2018 WL 4257967 (D. Ariz. Sept. 6, 2018) (recognizing appearances of unfairness inherent in use of filter teams and appointing special master to review materials seized from law firm); *United States v. Stewart*, No. 1:02-cr-00396, 2002 WL 1300059, at *8 (S.D.N.Y. June 11, 2002) ("it is important that the procedure adopted [for the review of seized materials] ... not only be fair but also appear to be fair"); *United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997) (use of filter team creates "appearance of unfairness"); *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) ("It is a great leap of faith to expect that members of the general public would believe any ... wall [between a filter team and a prosecution team] would be impenetrable; this notwithstanding our own trust in the honor of an AUSA.").

Correcting this risk to Movants' privilege, and minimizing the appearance of unfairness, serve to promote judicial integrity and public faith in the protections afforded by the privileges, without which the judicial system would not function.  Enjoining the Filter Team Procedures is in the public interest.

## IV.   CONCLUSION

For the reasons stated above, Movants Monteagle Ventures, LLC, Duane Miller, and Eric MacLeod respectfully request  that this Court (1) order the return or destruction of any privileged materials held by the Government; (2) enjoin the Government from continuing to implement the Filter Team Procedures, (3) modify the Filter Team Procedures in accordance with the Movants' Proposed Procedures, and (4) grant all other and further relief to which Movants may show themselves entitled.

Respectfully Submitted,


/s/ Sanford J. Boxerman
Sanford J. Boxerman (Mo. SBN 37436)
boxerman@capessokol.com
Sara G. Neill (Mo. SBN 53053)
neill@capessokol.com
**CAPES, SOKOL, GOODMAN & SARACHAN, PC**
8182 Maryland Avenue, 15th Floor
St. Louis, MO 63105
Telephone: (314) 721-7701
FAX: (314) 721-0554

**COUNSEL FOR MOVANT DUANE MILLER**
**CO-COUNSEL FOR MOVANT MONTEAGLE VENTURES,
LLC**


\*\*\*


/s/ Michael A. Villa, Jr.
Michael A. Villa, Jr. (Tex. SBN 24051475)
mvilla@meadowscollier.com
Brian J. Spiegel (Tex. SBN 24063987)
bspiegel@meadowscollier.com
Cari B. LaSala (Tex. SBN 24087890)
Texas State Bar No. 24087890
**MEADOWS, COLLIER, REED,
   COUSINS, CROUCH & UNGERMAN, LLP**
901 Main Street, Suite 3700
Dallas, Texas  75202
Telephone: (214) 744-3700
FAX: (214) 747-3732

**COUNSEL FOR MOVANT ERIC MACLEOD**
**CO-COUNSEL FOR MOVANT MONTEAGLE VENTURES,
LLC**